

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:EJD/AP             *271 Cadman Plaza East*
                      *Brooklyn, New York 11201*

December 17, 2024

By Hand and ECF

The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Jason Soto, 24-CR-511 (RER)

Dear Judge Bulsara:

  The government respectfully submits this letter in support of its application for the entry of a permanent order of detention pending trial for Jason Soto, also known as "Twin." As set forth below, the defendant—a member of the Cypress Gangsta Crips and three-time convicted violent felon, who is currently on supervised release in this District—has been indicted for the murder in-aid-of racketeering of gang leader Shakim Rivera that took place on February 22, 2015 in the Canarsie neighborhood of Brooklyn. The defendant's charged crimes, which carry the presumption of detention and are punishable by a mandatory life sentence or death, show that he is not an appropriate candidate for bail. The government also offers additional evidence showing the defendant's access to firearms, willingness to commit other crimes, and his gang's history of violence. For these reasons, the government submits that the defendant poses both a flight risk and a danger to community, and that no combination of conditions could secure his appearance at trial and the safety of the community if he were to be released on bail.

I. Background

  A. Investigation of Gang-Related Violent Crime at the Cypress Hills Houses

  By way of background, the Cypress Hill Houses, a New York City Housing Authority complex located in East New York Brooklyn ("Cypress"), has been besieged over the course of many years by gang- and drug-related violence, including numerous homicides, dozens of non-fatal shootings, and a significant number of incidents in which shots were fired, but no one was struck. In response to the relentless crime and violence plaguing the

residents of the more than 1,400 apartments in Cypress, the Federal Bureau of Investigation (the "FBI"), the New York City Police Department ("NYPD"), and the United States Attorney's Office for the Eastern District of New York (the "Office") conducted a long-term investigation into the gang-related violence, firearms-trafficking, drug-trafficking, armed robberies and other criminal activity occurring in and around Cypress. The investigation involved, among other investigative techniques, the use of court-authorized wiretaps. The defendant's cellphone was the subject of a court-authorized wiretap from March 23, 2016 until April 21, 2016.[1]

The investigation revealed a deadly gang turf war fought in Cypress—in the midst of residential buildings, stores, and a playground—between gangs that have aligned themselves, roughly, by where their members live within the housing complex.[2] The Bloods-associated "Frontside" section of Cypress has feuded with the Cypress Gangsta Crips (the "CGC") members of the "Backside" and "Teamside" sections of Cypress. The CGC is a subgroup or set of the Eight Trey Crips that operates in and around Cypress. An internal war broke out in 2015 within the CGC when high-ranking member Demetrius Graham, also known as "Duke," was murdered on February 19, 2015. Believing that CGC leader Shakim Rivera was responsible for Graham's murder, members of CGC planned swift retaliation. On February 22, 2015, the defendant, with the help of another Crip member, murdered Rivera. Two months later, on April 17, 2015, CGC member Dawan Turner, who was also believed to have been involved in Graham's murder, was killed outside of the defendant's home on Linden Boulevard. The investigation into the defendant's role in Turner's homicide is ongoing.

### B. The Murder of Shakim Rivera

By this indictment, the defendant is charged with the February 22, 2015 murder of Shakim Rivera. The indictment charges the defendant in two counts, for violations of Title 18, United States Code, Sections 1959(a)(1) (murder in-aid-of racketeering) and 924(j)(1) (causing death using a firearm).

On February 19, 2015, the day Graham was murdered, several members of CGC, including the defendant, joined a recorded phone call placed by the defendant's

---

[1] The government hereby provides notice to the defendant pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. The defendant also received notice of the wiretap interceptions at his arraignment in June 2016 when he was arrested for possessing and selling a firearm and distribution of crack cocaine. See ECF No. 16-CR-298 (ILG).

[2] The "Backside" section of Cypress is composed of the buildings on Linden Avenue; the "Teamside" section are the buildings on the western end of Sutter Avenue and the northern end of Fountain Avenue; and the "Frontside" section refers to the buildings on the eastern end of Sutter Avenue.

2

brother from inside the New York City Department of Corrections regarding Graham's murder. On the call, they discussed who was responsible for the murder and their desire to swiftly retaliate. The defendant explained to the others why he knew that their own leader, Shakim Rivera, was behind Graham's murder, and pledged to be the one who would kill Rivera in retaliation. The defendant traveled from Pennsylvania to Brooklyn and began planning Rivera's murder. On February 22, 2015, the defendant lured Rivera out an apartment in East New York and drove Rivera to Canarsie, where the defendant and another Crip member executed Rivera outside of 9011 Bayview Place. Rivera's body was found with one gunshot wound to the head.

   After Rivera's murder, members of CGC communicated about it with each other, praising the defendant for the murder of a "traitor" in their midst. The defendant bragged about his role in the murder to members of CGC and others and his desire to "go to war in Duke's [Graham's] name." Additionally, in a letter written by the defendant to another CGC member two months after Rivera's murder and 6 days after Turner's murder, the defendant bragged about his own status in the gang, stating that other gang members wanted to be around him because of the deeds he had done.

   In an autobiographical manuscript drafted by the defendant between 2016 and 2018, the defendant also wrote about his motivation for killing Rivera after Rivera had Graham murdered: "this comrade of ours was no longer a friend of ours, and that envy made him a monster." And about Graham, the defendant wrote: "I failed him as a brother, but would never fail him again."

   On April 7, 2016 and April 13, 2016, the defendant was intercepted on the wiretap discussing the fact that the police were investigating him for two murders that took place in 2015 [Rivera and Turner]. During these conversations, the defendant expressed his belief that someone had told on him for the murders, but acknowledged in conversation with another individual that in order to charge and convict him, a prospective witness would have to do more than provide information—they would have to testify against him in court.

  C. <u>Criminal Activities of the Cypress Gangsta Crips</u>

   Documents written by the defendant, wiretap recordings, social media and other evidence establish the defendant as an important member of the CGC.[3] Members of the CGC, including the defendant, have engaged in violent conduct and narcotics trafficking to enhance their prestige, expand the organization, and to make money. In addition, members of CGC, including the defendant, planned and committed robberies, and CGC members have posted images on Facebook to boast about proceeds from robberies. In an

---

[3] For example, in a wiretapped call on April 2, 2016, the defendant stated that he was a member of the Cypress Gangsta Crips: "[i]n my, in my hood, in my town its its its—my hood is Cypress, but the hood is like Cypress, Cypress Gangsta Crips, you see what I'm saying? So its like my hood, so me and Jala have, we all push the same hood."

April 2015 letter to a fellow CGC member, the defendant wrote about setting standards so high that younger gang members struggled to meet them and described himself as someone of a higher caliber than others in the gang, who was willing to commit more serious acts of violence and put himself at greater risk of harm as a result.

In the defendant's autobiographical manuscript, he wrote about his membership in the Crips and various principles of gang membership, including, but not limited to, the following:

- backing down from a physical fight is not an option;
- a gun is "mandated to those who graduate from tough guy to Gangsta";
- a shootout is "one of many ceremonies a youth must go through in the pursuit of manhood";
- not cooperating with law enforcement should be one's "natural reaction when you['re] in the streets";
- it is protocol for a Blood or a Crip to seek retribution for a "grievous act committed against their comrade."

CGC members achieved status in the gang, in part, by committing acts of violence. One example of the CGC's violent conduct was the July 8, 2014 murder of Rayvon Henriques for which CGC member Tyvon Bannister, also known as "Turtle," was charged and pleaded guilty to in this district. See ECF No. 17-CR-116 (BMC). On the night of the murder, July 8, 2014, Bannister and Shakim Rivera simultaneously shot Henriques at point-blank range, killing him after inflicting wounds on his neck, torso, and both arms. Henriques was targeted because of his association with the CGC's chief rivals, the Bloods-affiliated Frontside crew in Cypress. Bannister, who gained status and respect in CGC after this murder, ultimately ascended to a leadership role in CGC after the defendant murdered Rivera.

Facebook evidence shows that CGC members frequently exchanged firearms (which they call "sneakers"), planned robberies ("licks"), and trafficked in controlled substances ("dope" and "loud"). In addition to the defendant's distribution of crack cocaine, for which he was arrested in 2016, members of CGC trafficked in heroin, marijuana, cocaine, crack cocaine and prescription pills. CGC members have also intimidated victims and frequently seek to identify and publicize cooperating witnesses, with the goal of intimidating and discouraging them from testifying. Indeed, the tenet of punishing cooperation is well-established within the CGC and discussed by the defendant in his autobiographical manuscript. In the manuscript, the defendant referred to an individual that he believed worked with law enforcement against him as a rat, writing: "[i]t is now my self-imposed duty to wipe this disease from the face of the earth. As a hawk preys on a snake, so shall I bring doom to this predator." Other members of CGC share the defendant's desire for revenge against those who cooperate with law enforcement. A YouTube rap video posted in 2014, one week before Henriques' murder, is one example. The video is filmed almost entirely in and around Cypress, and, along with many other members of the CGC, it depicts Bannister

and Shakim Rivera. The lyrics refer to the CGC and its affiliated crews. Some of the other lyrics are aimed directly at cooperators: "you n**** keeps dropping dimes, you better keep it quiet or those shots fired," meaning those of you who provide information to law enforcement will be shot.

### D. The Defendant's Role in the CGC

The defendant committed significant acts of violence and dealt narcotics within the CGC. Wiretap evidence obtained from the defendant's phone in 2016, which covered only a thirty-day period, revealed a pattern of criminality on the part of the defendant. In recorded interceptions, the defendant was captured discussing the following: (a) efforts to smuggle narcotics into a prison facility; (b) his involvement in the acquisition and distribution of numerous firearms; (c) threats to assault various individuals with firearms or otherwise; (d) plans to commit armed robberies; (e) his prior commission of armed robberies of other narcotics traffickers; (f) various plots to kill individuals with whom the defendant maintained disputes; and (g) evading police detection with respect to two murders that he committed in 2015. Indeed, the significance of the threats, and their repeated nature, made the monitoring of the defendant's telephone difficult as it strained substantial law enforcement resources, given the repeated instances during which agents of the FBI and NYPD were required to respond to disrupt his threats to carry out violence against others. Some examples of the defendant's discussion of criminal activity follow.

On March 24, 2016, the defendant was intercepted lamenting the fact that he hadn't committed a robbery lately ("I ain't catch no licks lately"). He then acknowledged that he typically would steal narcotics with some frequency: "[u]sually I be like I would have caught something by now, like, a few pounds something." The defendant then casually recounted a prior robbery where he thought that he had killed a man when his gun discharged ("I thought I rocked a n****. So the fucking gun (UI), the shit went off, n****, I'm like, aww [LAUGHS]. I done caught a body out of town"). The defendant was also intercepted planning a robbery with Bannister in an April 12, 2016 phone call.

On April 8, 2016, the defendant called another person to request ammunition for his firearm: "you got like food [ammunition] and shit uhh for like um the toy [gun]?" The person he called indicated that he would "make some rounds" in an attempt to provide the defendant with the requested ammunition. On April 15, 2016, the defendant talked on the phone with another individual about purchasing some "44 specials" (i.e., 44 caliber bullets) and firearms. The individual stated that he knew someone selling "five drinks for like two bands," meaning five guns for $2,000. The person added that "all them shits out the store." The defendant was receptive, stating that both he and another member of CGC needed firearms.

On April 11, 2016, the defendant discussed with Bannister appropriate retaliation against an individual who might have disrespected Graham (who as explained above, went by "Duke"). Bannister wanted to impress on that individual not to mention Duke's name again: "tell him one thing . . . keep Duke name out yo mouth." Bannister

5

decided that he would at least damage the individual's car: "I was gonna put his car today in a parking lot with a nail and shit . . . fuck it I wanna pop his tires with it." The defendant suggested robbing him instead.

The defendant was intercepted discussing plans for violence against those deemed "rats" by the gang, such as on April 3, 2016, when he stated: "I just got the official word that somebody a rat about whatever so, we gotta handle that first." The defendant went on to emphasize that violence against those who cooperate with law enforcement is mandated: "somebody told about whatever so they close to us you know we got to handle that, it's our duty."

On April 6, 2016, the defendant was intercepted discussing a specific plot to murder an elderly lady with whom he had a dispute by poison. Based on the context of the communications, it appeared that a friend of the defendant's had been staying in the elderly woman's apartment and that the defendant or his friend had promised to pay her $100 as "rent." When the defendant's friend failed to pay her, the woman told the defendant's friend to leave and then communicated her frustration with the defendant to a family member of his. As soon as the defendant discovered that she had complained, he began discussing a plot to poison and kill her using tainted crack-cocaine ("Listen, listen I want to know if there is a way, listen to me, to make it bad, make it bad so when they do what they do with it they take them on a trip and they don't come back from it"). Upon learning of the conversation, law enforcement took action by warning the woman not to use any narcotics provided to her by the defendant. Members of law enforcement observed the defendant standing nearby on the day they warned the woman. The defendant was later intercepted acknowledging that he had gone to the building to harm the woman, but had been thwarted by the police presence ("I gotta go check this bitch . . . I'm just gonna handle it this shit . . . I actually went over there tonight to go check but 2 D's (i.e., detectives) came out the building my n****, I'm like, oh, what the fuck? They was like in the building you heard?").

II.     The Defendant's Criminal History

The defendant, who is 36 years old, has three serious, violent felony convictions for which he has spent a good portion of the past two decades in prison. Notably, he committed Rivera's murder while on parole for an earlier robbery conviction. That he does not consider his parole status as an impediment to his criminal conduct is apparent from his response to an unidentified male who asked in a text message, "When u get off dem papers (i.e., court supervision). We gotta get to dis bro," to which the defendant responded, "My n****, I'm plotting while I'm on papers (i.e., court supervision)."

On October 10, 2005, when the defendant was 16 years old, he was arrested and charged with robbery in the first degree, a class B felony, and criminal possession of a weapon in the second degree, a class C felony, for shooting a witness while attempting to rob a victim at gunpoint. He later resolved the case by pleading guilty to assault in the second degree, a class D violent felony under New York State law, and was sentenced to one year of imprisonment on January 3, 2007.

The defendant was convicted of his second violent felony for his participation in an armed robbery of a jewelry store, in which the employees of the store were ordered to lie on the floor where they were bound and held at gunpoint. One victim was released in order to open the safe, but was quickly bound again after the safe had been emptied by the robbers. The defendant pled guilty on March 17, 2009, to robbery and criminal conspiracy (with the intent of promoting or facilitating the crime of robbery), and was sentenced on May 12, 2009, to a term of imprisonment of 60 to 120 months' imprisonment on the robbery count and a consecutive term of two to four years' imprisonment on the conspiracy count. On May 29, 2009, the defendant's sentence was modified to allow the two sentences to run concurrently. In July 2013, the defendant was paroled to a halfway house.

The defendant received his third felony conviction after a June 2017 jury trial in this District. Specifically, he was convicted of being a felon in possession of a firearm, sale of a firearm by a convicted felon, and distribution of cocaine base. See ECF No. 16-CR-298 (ILG). These charges stemmed from his conduct on March 3, 2016, when he sold 28 twists containing crack cocaine to another person, and on May 24, 2016, when the defendant sold a .44 caliber handgun to a known felon. At a Fatico hearing held in January 2018, prior to the defendant's sentencing, the government sought to prove that in February of 2015, the defendant murdered Shakim Rivera, and that in April 2016 he plotted to poison an elderly woman, as described above. The Court found that the government had proved the defendant's involvement in both the Rivera murder and the poisoning plot. The defendant was sentenced to 120 months' incarceration in March 2018 and was released from federal custody on December 14, 2023 to Pennsylvania state custody, where he was incarcerated through May 17, 2024 for violating parole with respect to his federal case.

III.   The Defendant's Current Criminal Activity While on Supervised Release

The investigation into the defendant has revealed that he is currently involved in trafficking narcotics while on supervised release. Specifically, law enforcement has reviewed conversations between the defendant and others in which he appears to be involved in the sale of K2, a synthetic cannabinoid containing chemicals sprayed onto surfaces such as dry leaves or paper, prescription pills, and marijuana.

Specifically, on June 18, 2024, the defendant and his WhatsApp contact "K2 Shorty" had a drug-related conversation in which the defendant discussed purchasing K2 from "K2 Shorty" in order to traffic it to customers who are incarcerated: [4]

> K2 SHORTY:   Working on sheet right now[.]  What ml of spray do you want?

---

[4]   WhatsApp is an instant messaging and voice-over-IP service owned by Meta that allows users to send text, voice messages and video messages, make voice and video calls and share images, documents, user locations and other content. WhatsApp is end-to-end encrypted.

>       DEFENDANT: Cuzz, how am I supposed to know if that fire or not?  Not only that we do legal mail over here.[5]
>
>       K2 SHORTY:  My spray are[.]  And it turn people to zombie[.]  Real gas [.]  I do legal mail[.]  100% guarantee[.]

On June 29, 2024, the defendant and K2 Shorty had a subsequent conversation about the quality of K2 Shorty's narcotics and K2 Shorty informed the defendant that he would send the product to the defendant so that the defendant could determine its quality for himself.

On June 8, 2024, the defendant sent a member of the CGC a photograph of a hand with the palm open holding approximately 12 pills, to which the CGC member responded "Copy[.]"  The photograph shows each side of the pills, which are blue in color and stamped on one side with the letter "M" in a square and on the other side with the number "15."  Based on a review of open-source databases that identify pills based on color and distinctive markings, the pills in the photograph sent by the defendant appear to be 15 milligram morphine pills.

On July 6, 2024, the defendant received a text from a contact saved in his phone as "Elijah From Work" asking the defendant "Yo it's Elijah did you remember the samples [?]"[6]  The defendant replied "Copy my guy[.]"  On August 3, 2024, Elijah From Work informed the defendant that he was not going to be able to pick up the rest of the money until later and informed the defendant that he would bring the money "tomorrow," to which the defendant replied "[c]opy."

On August 31, 2024, the defendant sent a contact "Ha Gunna" a list of known types of high-end marijuana: "[p]latinum candy, white cherry poppers, white slushy, rainbow bellz, cherry gushers, zuper bubble, grape slurpie, zour patches," to which Ha Gunna replied with a shorter list of marijuana brands: "white cherry poppers, grape slurpie, zour patches, white sushy, [z]our patches[.]"

IV.    Legal Standard and Procedure

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156, "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will

---

[5]    K2 is commonly trafficked into jails by spraying the chemical compound onto sheets of paper and transmitting it to inmates through "legal mail," which is a method of communication typically used by attorneys to communicate with their incarcerated clients.

[6]    It is a common practice for individuals to request a sample of a narcotic to verify the quality of the product prior to purchasing a larger amount for distribution.

reasonably assure the appearance of the person as required and the safety of any other person and the community.'" United States v. English, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

A rebuttable presumption applies here because the defendant has been charged with a firearm offense under 18 U.S.C. § 924(j), and 18 U.S.C. § 924(c) is a lesser included offense of 18 U.S.C. § 924(j). 18 U.S.C. § 3142(e). The presumption means that the Court must initially presume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). When a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence. United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

Four factors guide the Court's determination of whether a defendant should be released on bail:

    (1)    "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";

    (2)    "the weight of the evidence against the person";

    (3)    "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

    (4)    "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

9

Where the evidence of guilt is strong, it provides "a considerable incentive to flee." Millan, 4 F.3d at 1046; see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

Additionally, the possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted).

Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness. See, e.g., Mercedes, 254 F.3d at 437 ("Roman has twice been convicted of weapon possession--one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to Roman's dangerousness.").

VI.  Argument

  A.  The Defendant Poses a Significant Risk of Flight

The defendant's incentive to flee if released on bail is strong. Not only does he face mandatory life in federal prison, or the death penalty, on the instant charges, he is aware that at his Fatico hearing in 2018, the Court found that the government had proven the defendant's role in Rivera's murder by a preponderance of the evidence. At the close of the hearing, Judge Glasser stated: "I haven't the slightest doubt that there is more than a preponderance of evidence. I would, without any hesitation, say the evidence was clear and convincing and had this matter gone to trial before a jury, Mr. Soto might well have been convicted of the murder of Shakim Rivera."

The evidence against the defendant is very strong. It consists of the defendant's own statements on recorded calls of his intent to kill Rivera, the defendant's discussions of the Rivera and Turner murders on the 2016 wiretap, the defendant's

10

admissions and description of his own motive in writings by the defendant, including his letter to another gang member and his autobiographical manuscript, video surveillance, cell site evidence, telephone records and phone extractions, witness testimony, and ballistic evidence, among other types of evidence.

Should the defendant be convicted, he will, at best, spend the rest of his life in jail. When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure his appearance. Even if the defendant accepts electronic surveillance and home confinement cannot adequately assure his return to court. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

### B. The Danger that the Defendant Poses to the Community Cannot be Overstated

And, of course, no bail package will protect the community. That is why the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which the Court has explained try to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." Millan 4 F.3d at 1049 (citation and internal quotation marks omitted). Here, the defendant has defied the terms of his current parole time and again, thereby demonstrating his unwillingness to obey court-imposed conditions.

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" Millan, 4 F.3d at 1048 (quoting legislative history). Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).

If released, the defendant would undoubtedly participate in and coordinate contact with persons whom he has previously threatened, and attempt to intimidate, threaten or harm anyone he believes may be a witness against him. See, e.g., United States v. Rivera, 09-CR-619 (SJF), 2010 U.S. Dist. LEXIS 39641, at *6-8 (E.D.N.Y. Apr. 21, 2010) (affirming Judge Orenstein's order of detention in part because the defendant knew where the victims lived, some of the victims were minors, and the defendant was capable of attempting to intimidate witnesses); see also United States v. Gotti, 02-CR-743 (RCC), 2004 U.S. Dist. LEXIS 3308, at *12-13 (S.D.N.Y. Mar. 2, 2004) ("[A] threat to witnesses in this case and to the integrity of the trial process weighs in favor of pretrial detention. This threat is especially grave here because the Government proffers that Defendant knows the identity of many of the Government's witnesses.").

Here, all of the factors militate against releasing the defendant. <u>First</u>, the nature of the offense could not be more serious. The defendant has been indicted in connection with a gang-related murder. <u>Second</u>, the defendant's "history and characteristics," including his relentlessly violent criminal history, his membership in the dangerous Crips gang, and his willingness to commit crimes while on supervised release, weigh in favor of detention. The evidence showing his current involvement in narcotics trafficking demonstrates that even now, after nearly a decade in jail, the defendant will not abide by the terms of his supervised release. <u>Third</u>, the defendant poses a significant danger to the individuals he has already threatened to harm, and the community at large if released, as releasing him would return him to his weapons, his drugs, and his network of criminal associates. The defendant and his gang have demonstrated their willingness to retaliate against cooperating witnesses and victims. The defendant's release would therefore immediately endanger potential witnesses and is a separate reason for keeping him detained pending trial. <u>See</u>, <u>e.g.</u>, <u>United States v. Gotti</u>, 02-CR-743 (RCC), 2004 U.S. Dist. LEXIS 3308, at *12-13 (S.D.N.Y. Mar. 2, 2004) ("[A] threat to witnesses in this case and to the integrity of the trial process weighs in favor of pretrial detention. This threat is especially grave here because the Government proffers that Defendant knows the identity of many of

the Government's witnesses."). As a result of the <u>Fatico</u> hearing held in 2018, the defendant knows the identity of some of the government's witnesses.[7] <u>Fourth</u>, the strength of the government's case is overwhelming and includes recorded conversations and admissions to his involvement in the charged murder.

VII.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the defendant be detained.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Emily J. Dean
Emily J. Dean
Andy Palacio
Assistant U.S. Attorneys
718-254-7000

cc:    Clerk of Court (SJB) (by E-Mail and ECF)

---

[7] The defendant also informed members of CGC that if they provided information to law enforcement about his role in Rivera's murder, he would kill them.

13